UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA  :                    11 Cr. 62 (PAC)

                  -v.-        :

RICARDO FERNANDEZ,        :

           Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America.


HOWARD S. MASTER
Assistant United States Attorney
   - Of Counsel -


July 9, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA  :                          11 Cr. 62 (PAC)

             -v.-                    :

RICARDO FERNANDEZ,              :

            Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - x

       The Government submits the following sentencing memorandum in response to defendant Ricardo Fernandez's sentencing submission and in anticipation of the sentencing of the defendant.  The defendant's claim, in his submission and in his letter, that he never knowingly made false statements or committed other wrongs in connection with his offense is preposterous.  In addition, while the Government does not dispute that Fernandez's wife is ill and incapable of being the sole caregiver for caring for his minor daughter, he has not, at least at present, explained why the circle of loved ones described in the Presentence Report, the defendant's sentencing submission, and his supporting letters would not be able to care for his daughter in his absence.  Accordingly, absent further information concerning the defendant's family circumstances, for the reasons stated below, a sentence within the applicable Sentencing Guidelines range of 30 to 37 months' imprisonment is warranted by the factors set forth in Title 18, United States Code, Section 3553(a), and should be imposed in this case, along with forfeiture of two bank accounts that facilitated the offense and $977,170, the defendant's gross proceeds of the offense.

**I.**     **The Offense Conduct**

       The defendant pleaded guilty before Your Honor to Count One of a seven-count first superseding Indictment (the "Indictment") charging him with a variety of offenses.  Count One charges the defendant with conspiracy to commit wire fraud and securities fraud, in violation of Title 18, United States Code, Section 371.  As described in the Presentence Investigation Report ("PSR") of the defendant, the conspiracy charged in Count One arose out of the defendant's participation, with others, in efforts to manipulate the price of so-called "penny stocks" in order to enable large shareholders who were funding the manipulation campaigns to sell their holdings at maximum profit.

       In summary, the defendant and other co-conspirators were manipulators for hire who agreed to accept compensation in exchange for their efforts to pump up the price of targeted securities through misleading and fraudulent touts, manipulative trading activities, and other conduct.  The purpose of their manipulative activities was to enable those who were funding the

The Honorable Paul A. Crotty
July 9, 2012
Page 2 of 9

manipulation to dump their shares on the market at a hefty profit at the expense of unsuspecting investors. Once the artificial support for price and liquidity created by the manipulation scheme was complete, these unsuspecting investors were left with shares that became virtually valueless and untradeable. Fernandez was paid to tout stocks, to hire others to tout, and to generate trading volume in stocks that were targeted by those funding the schemes. (Presentence Investigation Report ("PSR") ¶¶ 18-22).

The defendant's description of his own criminal conduct is both self-serving and incomplete. In the sentencing memorandum submitted by his counsel ("Sentencing Mem."), as well as in his own letter ("Fernandez Ltr."), which is submitted under Tab 1 of Exhibit A to the sentencing memorandum, Fernandez asserts a "firmly-held belief that he did not knowingly make false statements to the investing public concerning the stocks" he was paid to target (Sentencing Mem. 6), in the words of his counsel. Even more broadly, in his own letter, he asserts that "*At no time did I ever think or suspect or know that anything that I was doing was in any way shape or form against the law because if others were doing it I thought that it must be OK.*" (Fernandez Ltr. 3 (emphasis in original)). In a half-hearted attempt to reconcile this belief with his claim to credit for accepting responsibility for his offense, Fernandez attempts to blame two members of the charged conspiracy, Michael Oiring and another co-conspirator not named herein ("CC-1"), for what he describes as an unknowing descent into criminality. Fernandez claims that beginning in 2009, he "worked for" Oiring and CC-1 in an effort to earn money so that he could support his daughter, not realizing that in doing so he was actually committing a crime. (Sentencing Mem. 3-4). Fernandez asserts that while he described himself to Oiring and CC-1 as a sophisticated penny stock promoter with a "black book" of investors who could generate retail trading volume for targeted stocks and access to numerous marketing channels, he was nothing of the sort. Instead, according to Fernandez, he was secretly outsourcing the marketing work to third parties who were doing the work for him, and he lied about having access to retail trading customers, apparently soliciting money from Oiring and CC-1 based on fraudulent representations that some portion of the money was going to be used to generate retail trading activity. Fernandez himself tries to justify what he alleges is deception of other criminals as "faking it until I make it." (Fernandez Ltr. 4).

In reality, Fernandez was making it *by* faking it – making hundreds of thousands of dollars in profits by disseminating fake information to prospective investors, and helping artificially manipulate the prices of penny stocks, to the detriment of retail investors, in exchange for large amounts of money from many others, not simply Oiring and CC-1. Fernandez's fakery was on display during the first pump and dump scheme captured over the Title III interception that, along with substantial other evidence, led to Fernandez's arrest and prosecution—a scheme involving a company called Emerging World Pharma, Inc., which trades under the symbol "EWPI." As described in previously-filed documents in the case, Donna Levy served as a lead promoter in the scheme; she in turn engaged CC-1, along with other touters and market manipulators, in an effort to increase the liquidity and price of EWPI. During the afternoon of April 5, 2010, CC-1 learned that everyone would be promoting EWPI that evening, and he

The Honorable Paul A. Crotty
July 9, 2012
Page 3 of 9

understood from this information that insiders would be getting out of the stock during the next day as the stock promotion peaked. That same afternoon, CC-1 informed Fernandez of the nature and timing of the scheme, and Fernandez decided to purchase stock in EWPI before the "pump" phase of the scheme was carried out, and to participate himself in promoting the stock:

> CC-1: Were you able to buy that stock I gave you [i.e., EWPI]?
>
> FERNANDEZ: Yes, I did, I bought 10,000 shares.  I wish I would've bought more when I saw it at the end of the day at 62 [cents].  Jesus man, what a play.
>
> CC-1: Just so you know, just so you know tomorrow morning's gonna open up huge.
>
> FERNANDEZ: Wow.
>
> CC-1: So start exiting at some point tomorrow; watch that thing, okay?
>
> FERNANDEZ: Okay.  Dude, keep them coming.  Fantastic.
>
> CC-1: No problem, bro.  If you want to put it on your Twitter, you can now because I'm going out on my email today.
>
> FERNANDEZ: Okay.  Alright, consider it done.  I'll be putting it on there shortly.
>
> CC-1: So at least you can get a little credit for it.

FERNANDEZ then asked CC-1 to "check out" his website, pennywinners.com.  The next morning, on or about April 6, 2010, at 10:49 a.m., CC-1 participated in another call with FERNANDEZ.  During the call, CC-1 asked, "Ok, did you sell your EWPI?"  FERNANDEZ replied, "Oh yeah, I sold that shit at 87 [cents].  What a profit!  What a profit!"  CC-1 replied, "Good for you."

Fernandez thus knew on April 5, 2010, that EWPI was to be the target of manipulation activities that evening into the next morning; that EWPI would likely peak during the morning of April 6, 2012; and that EWPI would then be likely to decline precipitously after that — all events that in fact came to pass.  Fernandez then took advantage of the inside information he had obtained concerning the manipulation scheme, effectively doubling his money in less than a day by buying shares of EWPI before the scheme took hold and selling his shares the next morning before it collapsed, leaving unsuspecting investors holding soon-to-be valueless shares that FERNANDEZ had sold to them at a hefty profit.  But he did not stop there.  As promised, and as

The Honorable Paul A. Crotty
July 9, 2012
Page 4 of 9

reflected on pennywinners.com, Fernandez posted a tout concerning EWPI on April 5, 2012.[1]
Viewers of the home page likely would have seen, among other things, Fernandez's
representations that his stock picks were based on "Hours of Due Diligence"; that he had
"Decades of Experience" picking stocks; and that he conducted "In Depth Scans and DD [due
diligence] Concerning Our Picks."  Each of these assertions was a lie, based on the Title III
intercepts reflecting that Fernandez posted stock purchase recommendations that were based not
on scans or due diligence, but on the coordinated and paid-for efforts of market manipulators,
and based on Fernandez's own assertions in his sentencing submission that he had no experience
in the penny stock industry, much less "Decades" of it.

        The tout concerning EWPI is no better: it lists EWPI as "our Next Big Pick!  Since 1996
EWPI has been producing top quality USP generics at competitive prices based on a low
overhead corporate model. . . .  We believe that this company has a lot going for it and we
recommend that everyone puts it on their watch list!  Last price is .62 per share and technical
indicators are pointing up!  This week we expect the stock to see continued buying pressure."
Fernandez had no basis, at the time he posted this information, to know whether EWPI had
"been producing top quality USP generics at competitive prices" (in fact it had not).  His
exhortation to the investing public that "everyone put[] it on their watch list" was a trick,
intended to get unsuspecting investors to buy stocks from people with access to inside
information concerning the timing of the scheme, who would be selling the next day—people
like himself.  And his claims that "technical indicators are pointing up!" and that "[t]his week we
expect the stock to see continued buying pressure" were outright lies, based on Fernandez's lack
of awareness of any technical indicators recommending purchase of the stock, and his
knowledge that the "buying pressure" he was describing would evaporate the *next morning*,
rather than in a week's time.  That is why Fernandez himself intended to sell, and in fact sold, his
shares the morning after he bought them — facts that he did not disclose to investors who would
have received Fernandez's tout concerning EWPI.

        The EWPI scheme is illustrative of the enthusiasm with which he approached
manipulation activities and his lack of regard for the truth or for the investing public when
carrying out the scheme, but it is far from the most significant—in other instances, including the
scheme involving the stock trading under symbol MRNJ, Fernandez served in a much more
significant role in receiving funds from promoters and distributing them to a network of touters
that he maintained to help him carry out the goal of the scheme, and he made far more money
from his role in the scheme.  In 2009 and 2010, Fernandez took in just shy of $1 million in gross
revenue from market manipulation activities, over $250,000 of which was wire transferred from
an offshore trading account that co-conspirators *other than* Oiring and CC-1 used to facilitate
market manipulation activities.  His effort to lay blame for his predicament at the feet of his co-

_____

        [1] A copy of the home page of Pennywinners.com, and of the EWPI tout posted on April
5, 2010, are attached hereto as Exhibit A.

The Honorable Paul A. Crotty
July 9, 2012
Page 5 of 9

defendants in this case, *e.g.*, his claim that he is going to have to pay "dearly" because he "unknowingly overlooked several important details when I started to work with two of the co-defendants" (Fernandez Ltr. 4) utterly fails to account for his extensive participation in market manipulation activities with others beside Oiring or CC-1.

Moreover, the evidence does not bear out Fernandez's claim that his net revenue from that inflow of funds was less than $160,000, his tax returns notwithstanding.  In fact, a analysis of Fernandez's financial transactions through bank accounts maintained in the name of his business reflects that he profited over twice that amount, approximately $330,000, during the relevant period, including making $37,900 in payments to his father, $10,000 of which went for a partial payment on a Mercedes Benz; over $70,000 in check (debit) card purchases; over $200,000 in transfers to his personal bank account; over $2500 in payments on a Buick; and almost $10,000 in cash withdrawals.  And while Fernandez claims a lack of concern for material goods, lack of substantial income, and lack of current resources in his letter, Fernandez also had a luxury car, a five-bedroom home in an upper-class neighborhood (PSR ¶ 60), and at least according to account application documents submitted by the defendant to two different brokerage firms in mid-2010, a net worth of over $1 million, in part as a result of his participation in the scheme.[2]

Ultimately, the Court should reject Fernandez's efforts to avoid accountability for his role in the scheme.  Even if Fernandez was not the most sophisticated operator in the penny stock industry, he had to know that it was wrong to trick investors into paying artificially inflated prices for stocks he was helping to manipulate, based on a scheme that was kept secret from the investing public and that was intended to benefit him and his co-conspirators at the investors' expense.  Fernandez does not stand before the Court because of a mistaken belief that "if others were doing it I thought that it must be OK," or because he was "overlooking several important details" about the others who were working with him.  (Fernandez Ltr. 3-4).  He stands before the Court for sentencing because he knowingly defrauded investors by tricking them into buying penny stocks that he knew would soon be valueless; by lying to them about his qualifications and the basis for the content and timing of his recommendations, at minimum; and by engaging in other deceptive conduct.  He admitted as much when he stated, in response to follow up questioning at his plea allocution, "after time passed I did realize that the way we were going about it was not lawful.  Q: What time passed?  How is that?  A: Several months later.  Q: After the several months later had passed, did you continue to do it?  A: I did, your Honor."  (Plea Tr. 13).  Fernandez cannot possibly claim now that he did not know it was wrong and illegal to knowingly participate in a fraudulent scheme, particularly in view of his admission to the contrary several months earlier.

---

[2] The account application documents are submitted hereto as Exhibit B.

The Honorable Paul A. Crotty
July 9, 2012
Page 6 of 9

## II.    The Sentencing Guidelines & Forfeiture

As set forth in the defendant's PSR, the defendant's base offense level is 6, to which 14
levels are added because his gross pecuniary gain from the offense is between $400,000 and $1
million.  (PSR ¶¶ 35-36).  Specifically, bank records for the defendant reflect that he took in
$977,170 from his penny stock promotion business from January 2009 through October 2010.
The parties agree that this number is a reasonable estimation of gain for Guidelines purposes, at
least in the case of this defendant and others who are similarly situated to him.  While the
Guidelines call for use of loss as a measure of harm when assessing offense characteristics under
U.S.S.G. § 2B1.1, *see* U.S.S.G. § 2B1.1 app. note 3, and while numerous victims were in fact
harmed by market manipulation activities that Mackey helped facilitate, it is difficult to estimate
the loss attributable to the defendant, given the number of stocks that the defendant helped
manipulate, the varying degrees of his involvement and culpability in the manipulation schemes,
and the challenges associated with determining loss causation in the case of a promoter such as
the defendant.  While the use of the defendant's gross pecuniary gain from the offense does not
deduct for the defendant's own "marketing expenses" – e.g., payments made to others, including
touters and individuals engaged in manipulative trades through his accounts, the sum does not
include gross pecuniary gain earned by other market manipulators who worked in concert with
him and whose gains were not routed through the defendant's account, nor does it include gains
made by funders that were not paid out to or through the defendant for promotional expenses.
Accordingly, the sum represents a conservative estimate of the gain from the offense that was
reasonably foreseeable to the defendant.

Two levels are added pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(ii) because the defendant
committed the offense through mass marketing – the touts that he posted on the Internet and sent
out through emails and social media, and that he paid others to post. (PSR ¶ 37).  Arguably, a
three-level reduction is warranted in view of the defendant's timely guilty plea and acceptance of
responsibility for the offense, although the defendant's sentencing submission arguably calls this
into question.  (PSR ¶ 42).  With a Criminal History Category of I, his Guidelines range is 30 to
37 months' imprisonment.

The defendant also admitted during his plea to the forfeiture allegation of Count One of
the Indictment, which requires him to forfeit the contents of two bank accounts maintained in the
name of his business, Stock Awareness Group, as well as "all property, real and personal, that
constitutes or is derived, directly or indirectly, from gross proceeds traceable" to the offense.
Here, the defendant's gross proceeds of the offense is the $977,170 amount used to calculate the
defendant's offense level.  Accordingly, the Government seeks forfeiture in the amount of
$977,170, with the proceeds from forfeiture of the bank accounts to be applied against the

The Honorable Paul A. Crotty
July 9, 2012
Page 7 of 9

$977,170 forfeiture money judgment.[3]  The Government does not seek an order of restitution in addition to the substantial order of forfeiture, in view of the large number of potential victims of schemes in which the defendant participated, and the likelihood that complex issues of fact related to the cause and amount of these victims' losses would, in the view of the parties, unduly complicate and prolong the sentencing process.  See 18 U.S.C. § 3663A(c)(3).

## III.    Section 3553(a) Factors

### A.    The Defendant's History and Family Circumstances

Following calculation of the applicable Guidelines range, the Court must take into account the factors set forth in 18 U.S.C. § 3553(a) before imposing sentence.  The first factor requires the Court to examine the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1).  While the defendant has no criminal history and has submitted several letters attesting to the defendant's good character as a father, partner, son, neighbor, and churchgoer,[4] all of which counsel in his favor, perhaps his most compelling claim for a non-custodial sentence is the evidence that his common-law wife suffers from the effects of untreated alcohol addiction and would not be fit to care by herself for their 11-year-old daughter if he were incarcerated.

While the argument is being made under Section 3553(a), prior caselaw analyzing departures under the Sentencing Guidelines based on family circumstances warrants consideration by the Court, particularly as the Court is required to consider Guidelines and Policy Statements promulgated by the Sentencing Commission when imposing sentence.  18 U.S.C. §§ 3553(a)(4) & (5).  Under the Guidelines, "Family ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6 (Policy Statement).   While courts in this Circuit recognized that a downward departure based on family circumstances may be appropriate, "[b]ecause the Guidelines disfavor departure based on family responsibilities, such a departure is not permitted except in extraordinary circumstances." *United States* v. *Cutler*, 520 F.3d 136, 164 (2d Cir. 2008) (quoting *United States* v. *Smith*, 331 F.3d 292, 294 (2d Cir. 2003)).  Among other things, the Second Circuit has recognized that a downward departure based on family circumstances was inappropriate where the defendant failed to establish that he "was the only person capable of providing adequate care for the youngest children," in view of the fact that three older children could have provided care for the younger siblings, and that the defendant's "extended family was

---

[3] The proposed order of forfeiture will be submitted under separate cover.

[4] It is worth noting, however, that several of these letters repeat and rely in part on the defendant's self-serving assertion that he did not know he was committing a crime when he participated in the fraudulent scheme.  *See, e.g.*, Letter of Det. Wily Diaz, Miami Police Department, Ex. A Tab 7 ("Putting this good man in prison for something he did not knowingly do would not solve a thing.").

The Honorable Paul A. Crotty
July 9, 2012
Page 8 of 9

also available for caregiving."  *United States* v. *Madrigal*, 331 F.3d 258, 260 (2d Cir. 2003).

      Here, even if the defendant has established that he is the primary caregiver for his daughter, and that his common-law wife cannot step in as the sole caregiver in his absence, the record also reflects that the defendant has a very supportive extended family, including parents and siblings, who are located in South Florida near the defendant.  Absent some showing by the defendant that these other family members would be unable to help his common law wife care for the defendant's daughter in his absence, even if the absence is for a relatively brief period of time, the defendant should not be able to avoid facing the consequences of his actions based on family circumstances alone.

### B.      The Remaining Section 3553(a) Factors

      The Court also must to take into account the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).  The offense is a serious one.  Pump and dump schemes of the type that the defendant facilitated victimize real investors, unfairly enrich cheaters, and undermine the integrity of, and public confidence in, securities markets.  While the fraud is committed using the anonymous medium of the market, and the Government does not assert that the defendant actively wished harm on any investors, the fact remains that the defendant had to know that unsuspecting investors could be hurt by the promotional campaigns he and other co-conspirators carried out.

      The Court must also consider the need to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including, "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] (B) to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2). These purposes counsel in favor of a sentence within the applicable Guidelines range.  Not only is the offense serious, but the need to ensure the integrity of markets and to do justice to the victims of the schemes warrants such a sentence.  Similarly, the defendant and others similarly situated must be deterred from continuing to engage in frauds as potentially harmful as the ones he helped facilitate.

The Honorable Paul A. Crotty
July 9, 2012
Page 9 of 9

**IV.    Conclusion**

      For the reasons set forth above, based on the present record, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York

By:      /s/
                                          Howard S. Master
                                        Assistant United States Attorney
                                        212-637-2248

cc:    Marc Agnifilo & Osnat Lupesko-Persky, Esq., attorneys for the defendant (by email)